## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOE AND MARIE MARTINEZ**, individually and on
behalf of their son, **GLEN MARTINEZ**,

        Plaintiffs,

    vs.                            No. CIV 04-0737 MCA/LFG

**ESPANOLA PUBLIC SCHOOLS**, *et al.*,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the *Individual Defendants' Motion for Qualified Immunity or to Dismiss Claims Pursuant to Rule 12(b)(6) for Failure to State a Claim* [Doc. 27] filed on June 10, 2005, and the parties' *Joint Motion to Vacate Pretrial Conference* [Doc. 43] filed on December 20, 2005.  Having considered the parties' submissions, the relevant law, and being fully advised in the premises, the Court grants the motion to dismiss in part and denies the motion to dismiss in part for the reasons set forth below.  With respect to the remaining claims and Defendants, the stay of discovery previously entered in this matter is lifted, and the motion to vacate the pretrial conference is denied.  The Court will meet with the parties to establish new pretrial deadlines at the pretrial conference scheduled for 9:00 a.m. on January 3, 2006.

## I.    BACKGROUND

Plaintiffs Joe and Marie Martinez instituted administrative proceedings under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 to 1487, with respect to the public education of their son, Plaintiff Glen Martinez, at Espanola Valley High School in Espanola, New Mexico.  At this juncture, there is no dispute that Plaintiffs have exhausted their administrative remedies with respect to at least some claims.

On June 30, 2004, Plaintiffs filed this civil action against Defendants Espanola Public Schools (EPS), Mary Agnes Martinez, Robert Romero, Michael Katco[1], Michael Van Damme, Rachel Mora, Adam Romero, John Garcia, and Beverly Averitt alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a(a)(2), and several provisions of the United States Constitution which are actionable under 42 U.S.C. § 1983.  [Doc. 1.]  Plaintiffs filed an *Amended Complaint* [Doc. 5] on October 25, 2004, before any responsive pleading was filed.  Pursuant to the terms of a *Scheduling Order* [Doc. 12] filed on March 14, 2005, Plaintiffs filed a *Second Amended Complaint* [Doc. 14] on March 30, 2005.

As to Defendant Espanola Public Schools (EPS), Plaintiffs' *Second Amended Complaint* asserts statutory claims for discrimination and retaliation in violation of the ADA and Section 504 of the Rehabilitation Act, as well as constitutional claims for municipal

---

[1]The individual Defendants note in their brief that "Katko" is misspelled as "Katco" in Plaintiffs' pleading.  Absent an agreement by the parties to change the spelling, the Court will use the spelling of this Defendant's name as it appears in Plaintiffs' pleading.

liability under 42 U.S.C. § 1983 based on alleged violations of Plaintiff Glen Martinez's (1) Fourteenth Amendment right to procedural and substantive due process relating to his property interest in receiving a free appropriate public education, (2) Fourteenth Amendment right to substantive due process relating to his liberty interest in bodily integrity and personal security, (3)  Fourth Amendment right to be free from unreasonable seizures, and (4) Fourteenth Amendment right to equal protection under the law.  There are no pending dispositive motions with respect to any of these claims against Defendant EPS, and therefore they are not the subject of further discussion in this *Memorandum Opinion and Order*.

Plaintiffs also assert most of the above claims against different groupings of individual Defendants, who are described in the *Second Amended Complaint* as follows. From approximately June 2000 until after Plaintiff Glen Martinez's premature graduation in May 2001, Defendant Mary Agnes Martinez was Assistant Special Education Director at EPS, and Defendant Robert Romero was the school system's Special Education Director.  Michael Katco was a Vice Principal at Espanola Valley High School and Defendant Beverly Averitt was the high school's Principal during this time period which coincided with Plaintiff Glen Martinez's last year at the school.  Defendants Michael Van Damme and Rachel Mora worked as special-education teachers in the classroom where Plaintiff Glen Martinez was assigned during his final year at the school.  Adam Romero was an educational assistant assigned to Plaintiff Glen Martinez from approximately 1999 to 2001, and John Garcia was this student's special-education teacher during the 1997 school year.

Plaintiffs allege that Defendants Mary Agnes Martinez, Robert Romero, Rachel Mora, and Michael Katco are individually liable for violating the ADA and Section 504 of the Rehabilitation Act by prematurely graduating Plaintiff Glen Martinez from high school in retaliation for his parents' protected activities under these statutes.  Plaintiffs also allege that Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, Rachel Mora, and Beverly Averitt are individually liable for substantive and procedural due-process violations stemming from this deprivation of the student's property interest in free appropriate public education.

With respect to their claims for deprivation of the student's liberty interest in bodily integrity and personal security protected under the substantive component of the Due Process Clause, Plaintiffs allege that Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, Adam Romero, John Garcia, and Beverly Averitt are individually liable.  With respect to their Fourth Amendment claim for unreasonable seizures, Plaintiffs allege that Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, Michael Van Damme, Rachel Mora, and Adam Romero are individually liable.  Finally, Plaintiffs' equal-protection claim applies to Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, Michael Van Damme, Rachel Mora, and Beverly Averitt.

The claims set forth in the *Second Amended Complaint* and the respective Defendants to which these claims apply are summarized in the table below:

**Table 1:   Claims and Defendants in Plaintiffs' Second Amended Complaint**

| | Espanola Public Schools | Mary A. Martinez | Robert Romero | Michael Katco | Michael Van Damme | Rachel Mora | Adam Romero | John Garcia | Beverly Averitt |
|---|---|---|---|---|---|---|---|---|---|
| ADA & Section 504 Discrimination | X | | | | | | | | |
| ADA & Section 504 Retaliation | X | X | X | X | | X | | | |
| 42 U.S.C. § 1983 Due Process Property Interest in Education | X | X | X | X | | X | | | X |
| 42 U.S.C. § 1983 Due Process Liberty Interest in Bodily Integrity | X | X | X | X | | | X | X | X |
| 42 U.S.C. § 1983 Fourth Amendment Seizure | X | X | X | X | X | X | X | | |
| 42 U.S.C. § 1983 Equal Protection | X | X | X | X | X | X | | | X |

Although the grounds for many of Plaintiffs' claims against the individual Defendants overlap to some degree, each claim has a distinct factual basis.  Plaintiffs' ADA and Section 504 claims against the individual Defendants rely on an alleged causal relationship between Plaintiffs Joe and Marie Martinez's complaints to school personnel about their son's education and the decision by school personnel to prematurely exit Plaintiff Glen Martinez from Espanola Valley High School in May 2001.  Plaintiffs also attempt to recast their complaint about this premature graduation (and earlier attempts to exclude the student from school) as a deprivation of a property interest protected by the substantive and procedural components of the Due Process Clause.

Plaintiffs other substantive due-process claim, which rests on Plaintiff Glen Martinez's liberty interest in bodily integrity and personal security, arises from the allegedly

dangerous and abusive classroom environment to which he was subjected during his attendance at Espanola Valley High School.  To support this substantive due-process claim, Plaintiffs point to specific instances of misconduct by school personnel, including an alleged altercation between Defendant Adam Romero and Plaintiff Glen Martinez in February 2001, and Defendant John Garcia's alleged failure to monitor and supervise Plaintiff Glen Martinez during a September 1997 incident in which the student ran away from the school campus and was found off campus hours later covered with cactus spines.

Insofar as this substantive due-process claim relies on instances of physical restraint, it may overlap with Plaintiffs' Fourth Amendment claims against the individual Defendants. In support of such Fourth Amendment claims, Plaintiffs' *Second Amended Complaint* refers to an alleged daily practice of confining Plaintiff Glen Martinez in a school desk by placing the desk's only opening against a wall so that the student would have to move the desk away from the wall in order to exit it.

Finally, to support their equal-protection claim, Plaintiffs allege that some of the individual Defendants harbored an invidious hostility or contempt toward the developmentally disabled that caused them to treat Plaintiff Glen Martinez differently than other similarly situated students in ways that bear no rational relationship to the legitimate needs occasioned by his disability.  In particular, Plaintiffs point to alleged differences in the safety or dangerousness of the classroom environment, the timing and procedure for graduation, the qualifications and training of teachers and staff, the opportunity to attend school, and the keeping of report cards and other school records.

On June 10, 2005, all of the individual Defendants filed a motion to dismiss Plaintiffs' claims against them under Fed. R. Civ. P. 12(b)(6). The grounds for the individual Defendants' motion are fourfold. First, they assert that the relevant provisions of the ADA and Section 504 of the Rehabilitation Act do not provide any legally viable basis for imposing personal liability on individual school employees. Second, they assert that 42 U.S.C. § 1983 does not provide an alternative mechanism for bringing ADA or Section 504 claims against individuals, and that the doctrine of qualified immunity shields them from Plaintiffs' constitutional claims under 42 U.S.C. § 1983 because such constitutional claims are not founded on clearly established law. Third, they assert that Plaintiffs' claims against them in their official capacities should be dismissed because they duplicate and add nothing to Plaintiffs' claims against Defendant EPS. Finally, the individual Defendants assert that the statute of limitations bars any claims under 42 U.S.C. § 1983 arising from the 1997 incident in which Glen Martinez allegedly left the school grounds due to a lack of supervision by Defendant John Garcia.

## II.  ANALYSIS

### A.  Standard of Review.

Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief may be granted at any time. See Fed. R. Civ. P. 12(h)(2). Dismissal on these grounds may occur *sua sponte* or upon a defendant's motion. See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001) (concluding that "sua sponte dismissal of a meritless complaint that cannot be salvaged by amendment comports with due process and

does not infringe the right of access to the courts").  When requested in a defendant's motion, dismissal under this rule is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). *Sua sponte* dismissal in this context is only appropriate when it is patently obvious that the plaintiff cannot prevail on the facts alleged, and allowing an opportunity to amend would be futile.  See Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir.1991); Curley, 246 F.3d at 1284.

"The court's  function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir.1991).  Accordingly, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party. GFF Corp., 130 F.3d at 1384.  "In addition to the complaint, the [C]ourt may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002).  Although Plaintiffs' pleadings are to be liberally construed, mere conclusory allegations without supporting factual averments will not suffice. See Brown v. Zavaras, 63 F.3d 967, 972 (10th Cir. 1995).

**B.**     <u>**Plaintiff's Official-Capacity Claims Against Individual Defendants**</u>

In the context of civil-rights litigation, the Supreme Court has explained the distinction between being personal-capacity suits and official-capacity suits as follows:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. <u>See, e.g.</u>, <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 237-238 (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 690, n. 55 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. <u>Brandon</u> [v. Holt] 469 U.S. [464], 471-472 [(1985)]. It is not a suit against the official personally, for the real party in interest is the entity.

<u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66 (1985).

In this case, the individual Defendants seek the dismissal of Plaintiffs' claims against them in their official capacity on the grounds that such claims simply duplicate the claims already asserted against the institutional entity, Defendant EPS. In response to the individual Defendants' motion, Plaintiffs agree that it is unnecessary and duplicative to name the individual Defendants in their official capacity in this case because the relevant statutes allow Defendant EPS to be held liable for all compensatory damages they incurred. I agree with the parties that Plaintiffs' claims against the individual Defendants in their official capacity should be dismissed at this juncture in order to avoid redundancy and unnecessary confusion of the issues. Therefore, Defendant's motion to dismiss is granted in part with respect to these official-capacity claims against the individual Defendants.

C.    **Plaintiffs' Retaliation  Claims Under the ADA and Section 504**

Plaintiffs' claim for retaliation in violation of the ADA and Section 504 of the Rehabilitation Act is the only claim asserted against individual Defendants in the *Second Amended Complaint* that does not depend on 42 U.S.C. § 1983 and the United States Constitution.  The individual Defendants move to dismiss this statutory retaliation claim on the grounds that neither the ADA nor Section 504 of the Rehabilitation Act provide for such claims against individual Defendants in their personal capacities.

I conclude that Plaintiffs have failed to state a retaliation claim against any of the individual Defendants upon which relief can be granted under the ADA or Section 504.[2] This conclusion follows the majority view expressed by other courts and accords with the principles of statutory interpretation set forth by the Supreme Court in Barnes v. Gorman, 536 U.S. 181 (2002), and United States Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597 (1986).

Section 504 of the Rehabilitation Act (as well as the relevant provisions of the IDEA) invoke "Congress's power under the Spending Clause, U.S. Const., Art. I, § 8, cl. 1, to place conditions on the grant of federal funds."  Barnes, 536 U.S. at 185-86; see Sellers v. The Sch. Bd. of the City of Manassas, 141 F.3d 524, 531 (4th Cir. 1998) ("IDEA is a joint

---

[2]As the individual Defendants note in their brief, my analysis of this issue is reflected in a previous ruling in another case involving an Espanola Public Schools student.  See N.T. v. Espanola Pub. Schs., No. CIV 04-415 MCA/DJS (D.N.M. May 20, 2005) (unpublished memorandum opinion and order dismissing statutory claims against Defendant Mary Agnes Martinez).  Plaintiffs have not cited any subsequent authority that would call into question the result of this analysis at this time.

federal-state program enacted under Congress' spending power."); <u>Garcia v. S.U.N.Y. Health Sciences Ctr.</u>, 280 F.3d 98, 113 (2d Cir. 2001) (concluding that "§ 504 was enacted pursuant to Congress's authority under the Spending Clause of Article I").  As such, these statutes are characterized as "'much in the nature of a contract:  in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'"  <u>Barnes</u>, 536 U.S. at 186 (quoting <u>Pennhurst State School and Hospital v. Halderman</u>, 451 U.S. 1, 17 (1981)); <u>see also</u> <u>Paralyzed Veterans</u>, 477 U.S. at 605-06; <u>cf.</u> <u>Jackson v. Birmingham Bd. of Educ.</u>, 125 S. Ct. 1497, 1508-09 (2005) (applying Spending Clause principles to suit against funding recipient under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a)).  Under the contract-law principles applied by the Supreme Court in this context, the proper defendant in a suit under such Spending Clause legislation is the public entity, program, or activity that is the recipient of the federal funds, not its employees.

This conclusion follows from the basic distinction between the *recipients* of federal funds and the *beneficiaries* of such funds which the Supreme Court articulated in <u>Paralyzed Veterans</u>, 477 U.S. at 605-11, and its progeny.  Under this distinction, the liability that may be imposed by the Spending Clause legislation at issue here does not follow the federal funding "'past the recipient to those who merely benefit from the aid.'"  <u>United States v. LaHue</u>, 170 F.3d 1026, 1029 (10th Cir. 1999) (quoting <u>Paralyzed Veterans</u>, 477 U.S. at 607); <u>accord</u> <u>Gallagher v. Croghan Colonial Bank</u>, 89 F.3d 275, 278 (6th Cir. 1996).  Thus, "[e]mployees of the recipients of federal financial assistance are not in themselves the recipients of such assistance."  <u>Grzan v. Charter Hosp.</u>, 104 F.3d 116, 119-20 (7th Cir.

1997).  Because they are not recipients of such assistance, such employees are not subject

to suit in their personal capacity under the Spending Clause legislation at issue here.  See id.

The Tenth Circuit has pointed out that "if the statutes were construed to extend to all

those who receive an indirect economic benefit from the federal assistance, '[t]he statutory

"limitation" on [the anti-discrimination statute's] coverage would virtually disappear, a result

Congress surely did not intend.'"  LaHue, 170 F.3d at 1030 (quoting Paralyzed Veterans, 477

U.S. at 609).  Allowing such statutory limitations to disappear in this manner by ignoring the

distinction between *recipients* and *beneficiaries* of federal funds would also run contrary to

the principles articulated in Barnes, 536 U.S. at 186-87.   Under these principles, the

conditions that Congress intends to impose on the grant of federal funds must be stated

unambiguously so as to support the conclusion that the recipient of the funds accepted those

conditions knowingly and voluntarily.  The Spending Clause legislation at issue in this case

does not set forth an unambiguous condition that would impose liability on individual

employees in their personal capacity.  Based on the authorities cited above, I conclude as a

matter of law that neither Section 504 of the Rehabilitation Act nor the relevant provisions

of the IDEA provide a basis for holding any of the individual Defendants liable in their

personal capacities under the circumstances alleged in this case because they are not

recipients of federal funds.

Plaintiff's retaliation claim under the ADA requires separate analysis because, in

enacting Title II of the ADA, Congress did not expressly rely on the Spending Clause and

instead invoked its authority under the Commerce Clause and Section 5 of the Fourteenth

-12-

Amendment.  See 42 U.S.C. § 12101(b)(4); Thompson v. Colorado, 278 F.3d 1020, 1026 (10th Cir. 2001); Davoll v. Webb, 194 F.3d 1116, 1142 (10th Cir. 1999); cf. Schrader v. Ray, 296 F.3d 968, 974 (10th Cir. 2002) (contrasting "the blanket involuntary coverage of the ADA" with "the Rehabilitation Act's coverage [which] extends only to entities that choose to receive federal assistance.").  This lack of a specific nexus to federal funding does not mean that the scope of liability under the ADA is limitless, however, because several provisions of the ADA specifically rely upon and incorporate the remedies and procedures of other statutes.

In the context of employment discrimination, for example, the Tenth Circuit has concluded that Title I of the ADA precludes personal capacity suits against individuals who do not otherwise qualify as "employers" under the relevant statutory definition of that term. See Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999).  While Butler is distinguishable to some degree because it involved Title I of the ADA rather than Title II or the prohibition on retaliation contained in 42 U.S.C. § 12203(a), the principles of statutory interpretation used in that case lead to the same conclusion with regard to the issue presented here.

In Butler, 172 F.3d at 744, the Tenth Circuit drew a parallel between Title I of the ADA and Title VII of the Civil Rights Act, noting that the two statutes share common features that operate to preclude employment-discrimination suits against individual employees in their personal capacity.  In the present case, I draw a similar parallel between

-13-

the relevant provisions of the ADA and two other statutes, namely Section 504 of the

Rehabilitation Act and Title VI of the Civil Rights Act.  As noted by the Supreme Court,

> Section 203 of the ADA declares that the "remedies, procedures, and rights set
> forth in [§ 505(a)(2) of the Rehabilitation Act] shall be the remedies,
> procedures, and rights this subchapter provides" for violations of § 202.  42
> U.S.C. § 12133.  Section 505(a)(2) of the Rehabilitation Act, in turn, declares
> that the "remedies, procedures, and rights set forth in title VI of the Civil
> Rights Act of 1964 ... shall be available" for violations of § 504, as added, 92
> Stat. 2983, 29 U.S.C. § 794a(a)(2).  Thus, the remedies for violations of § 202
> of the ADA and § 504 of the Rehabilitation Act are coextensive with the
> remedies available in a private cause of action brought under Title VI of the
> Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which prohibits racial
> discrimination in federally funded programs and activities.

Barnes, 536 U.S. at 185.  For these reasons, it is appropriate to interpret the remedies and

procedures available under Title II of the ADA in a manner that parallels the interpretation

of Section 504 of the Rehabilitation Act and Title VI of the Civil Rights Act.

As noted above, Section 504 and Title VI are Spending Clause legislation and do not

provide a basis for personal-capacity suits against individual employees.  See Grzan, 104

F.3d at 119-20. Thus, insofar as the relevant provisions of the ADA incorporate the same

remedies, procedures, and rights available under Section 504 and Title VI, see 42 U.S.C. §§

12133, 12203(c), the former statute does not provide a basis for imposing liability on

individuals in their personal capacity.  Cf. Butler, 172 F.3d at 744 (drawing a similar

conclusion based on parallels between Title I of the ADA and Title VII of the Civil Rights

Act).

Such an interpretation accords with the plain language of Title II of the ADA, which

only imposes duties on "public entities."  See 42 U.S.C. § 12132.  "That term, as it is defined

within the statute, does not include individuals." Alsbrook v. City of Maumelle, 184 F.3d 999, 1008 n.8 (8th Cir. 1999) (en banc) (citations omitted); accord Miller v. King, 384 F.3d 1248, 1276-78 (11th Cir. 2004); Garcia, 280 F.3d at 107; Khan v. Albuquerque Pub. Sch., No. CIV 03-118 JP/RLP, slip. op. at 5-7 (D.N.M. May 22, 2003) (unpublished memorandum opinion and order dismissing ADA claims against individual defendant).

It is true that the ADA's anti-retaliation provision is not contained in Title II, and it prohibits retaliation by "persons" rather than just "public entities" or "employers." See 42 U.S.C. § 12203(a). Some courts have inferred that by using the word "persons" in this provision, Congress must have intended to allow the pleading of an ADA retaliation claim against individual defendants in their personal capacity.[3] See, e.g., Shotz v. City of Plantation, 344 F.3d 1161, 1179-80 (11th Cir. 2003). Other courts have reached the opposite conclusion, reasoning that the use of the word "person" in 42 U.S.C. § 12203(a) cannot be read in isolation, but must be viewed in the context of the statute as a whole, including the specific remedies and procedures cited in 42 U.S.C. § 12203(c). See Key v. Grayson, 163 F. Supp. 2d 697, 703-04 (E.D. Mich. 2001) (collecting cases).

---

[3]Plaintiffs cite an unpublished order and judgment of the Tenth Circuit in support of their ADA retaliation claim. See Childs v. Nat'l Jewish Ctr. for Immunology and Respiratory Med., 129 F.3d 130, 1997 WL 694606 (10th Cir. 1997). I find that this unpublished order and judgment has no persuasive value because it does not address many of the arguments raised by the more recent authorities cited in this *Memorandum Opinion and Order*, and because it involved the *sua sponte* dismissal of a *pro se* litigant's claim as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B), for which no adequate record was developed in the trial court.

Even the courts that recognize personal-capacity suits in this context acknowledge that congressional intent with respect to retaliation claims is by no means obvious from the plain language of the statute.   Indeed, the <u>Shotz</u> court found that the ADA's retaliation provision is "inscrutable," and that "Congress's intent [is] cryptic and imprecise," with respect to whether the scope of liability for retaliation claims is defined by the "rights creating" language in 42 U.S.C. § 12203(a), or by the language setting forth the available remedies and procedures in 42 U.S.C. § 12203(c).   <u>Shotz</u>, 344 F.3d at 1177.

In the context of public services, the latter provision simply incorporates the remedies and procedures that would be available under Title II of the ADA in this context.   <u>See</u> <u>Van Hulle v. Pacific Telesis Corp.</u>, 124 F. Supp. 2d 642, 646 (N.D. Cal. 2000) (citing 42 U.S.C. § 12133).   As noted above, the remedies and procedures available under Title II of the ADA are a lawsuit against either a "public entity," or a "'head of department, agency, or unit' sued in his official capacity," rather than a lawsuit against an individual in his or her personal capacity.   <u>Key</u>, 163 F. Supp. 2d at 704 (citing 42 U.S.C. §§ 12203(c), 12133, 29 U.S.C. § 794a, and quoting 42 U.S.C. § 2000e-16).   Thus, if 42 U.S.C. § 12203(c) determines the scope of liability for ADA retaliation claims, then the Court would simply follow the general rule applied in the context of litigation over public services under Title II of the ADA, which does not extend liability to individuals sued in their personal capacities.   <u>See</u> <u>Van Hulle</u>, 124 F. Supp. 2d at 646.

The <u>Shotz</u> court chose a more complicated route and arrived at the conclusion that the ADA's retaliation provision was intended to go further than the Spending Clause legislation

referenced in Title II and could provide an independent basis for imposing liability on persons in their individual capacity. See Shotz, 344 F.3d at 1179-80. This choice runs contrary to the reasoning of the majority of other courts that have addressed the issue because it unties the ADA's retaliation provision from the specific remedies and procedures provided elsewhere in the statute. See Baird v. Rose, 192 F.3d 462, 472 (4th Cir.1999); Key, 163 F. Supp. 2d at 704; Van Hulle, 124 F. Supp. 2d at 645-46; Santiago v. City of Vineland, 107 F. Supp. 2d 512, 551-52 (D.N.J. 2000); Stern v. California State Archives, 982 F. Supp. 690, 694 (E.D. Cal. 1997); Cable v. Department of Developmental Svcs., 973 F. Supp. 937, 943 (C.D. Cal. 1997); Kautio v. Zurich Ins. Co., No. 97-2411, 1998 WL 164623, at *1-2 (D.Kan. Mar.18, 1998) (unpublished disposition).

The Shotz court also did not address the constitutional questions presented by a construction of the statute that allows any person to be held liable in his or her individual capacity regardless of the context in which the retaliation occurred. Some courts have questioned whether other provisions of the ADA are a valid exercise of congressional power under the Commerce Clause or Section 5 of the Fourteenth Amendment. See, e.g., Thompson, 278 F.3d at 1034 (concluding, in context of Eleventh Amendment immunity, that a particular application of Title II of the ADA was not a valid exercise of congressional power under Section 5 of the Fourteenth Amendment); Alsbrook, 184 F.3d at 1010 (same); Garcia, 280 F.3d at 109-10 (same); Miller, 384 F.3d at 1275-76 (same); McCarthy v. Hawkins, 381 F.3d 407, 435 (5th Cir. 2004) (Garza, J., concurring in part and dissenting in

part) (expressing the view that a particular application of Title II of ADA was not valid exercise of congressional power under the Commerce Clause ).

The Shotz court's construction of the ADA's retaliation provision raises such questions because it unties the prohibition on retaliation stated in 42 U.S.C. § 12203(a) from the remedies and procedures cited in 42 U.S.C. § 12203(c).

> Section 12203(c) indicates that the remedy a retaliation claimant is afforded depends on whether the alleged retaliation occurred with respect to employment, public services or public accommodations.   For instance, a claimant "who complains that a 'person' retaliated against him or her in the context of employment is referred to Section 12117," which is the remedial provision for Subchapter I.  Stern, 982 F.Supp. at 693.  In the same fashion, a claimant asserting that a "person" retaliated against him or her in the context of public services is referred to Section 12133, the remedial provision for Subchapter II.  Id.  "An aggrieved party who complains that a 'person' retaliated against him or her in the context of public accommodation is referred to Section 12188," the remedial provision for Subchapter III.

Van Hulle, 124 F. Supp. 2d at 646.  Thus, if 42 U.S.C. § 12203(a) is untethered from 42 U.S.C. § 12203(c), then liability for retaliation claims is no longer limited to the specific contexts of employment, public services, and public accommodations that are set forth elsewhere in the ADA.  Without this limitation, it becomes more difficult to establish the interstate nexus that is required to ensure that the ADA's retaliation provisions are a valid exercise of Congress' authority under the Commerce Clause, and to establish the nexus with the rights guaranteed by the Fourteenth Amendment that is required to render these provisions a valid exercise of Congress' enforcement powers.

It is a basic principle of statutory interpretation that "'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and

by the other of which such questions are avoided, [the Court's] duty is to adopt the latter.'" Jones v. United States, 526 U.S. 227, 239 (1999) (quoting United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408 (1909)).  Applying the above principles of statutory interpretation to this case, I conclude that the more logical and consistent reading of the ADA is to determine the scope of liability for retaliation claims by reference to the language setting forth the available remedies and procedures,  42 U.S.C. § 12203(c), rather than viewing the language in the retaliation provision alone, 42 U.S.C. § 12203(a).

This reading avoids the doubtful constitutional questions created by viewing 42 U.S.C. § 12203(a) in isolation, because it limits the scope of liability according to existing remedies and procedures available in the specific contexts of employment, public services, and public accommodations that are set forth elsewhere in the ADA and the other statutes cited therein.  Courts are more likely to uphold the constitutionality of legislation enacted under Section Five of the Fourteenth Amendment when the statutory goal, *i.e.*, prohibiting retaliation, is closely linked to specific, well-established remedies and procedures for achieving this goal.  See, e.g., Tennessee v. Lane, 541 U.S. 509, 124 S. Ct. 1978, 1993 (2004) (declining to consider Title II of the ADA in the context of public education but finding that a portion of the statute "unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services").  Such linkage ensures "'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'"  Id. at 1978 (quoting City of Boerne v. Flores, 521 U.S. 507,

520 (1997)).  Similarly, the interstate-nexus requirement required for a valid exercise of Congress' power under the Commerce Clause is more easily satisfied if the statutory goals are placed in a specific context, such as employment.  See, e.g., United States v. Miss. Dep't of Pub. Safety, 321 F.3d 495, 501 (5th Cir. 2003) (concluding that the ADA's regulation of the national employment market is a valid exercise of Congress' power under the Commerce Clause).

Because I do not read 42 U.S.C. § 12203 as expanding the scope of liability under the ADA to cover persons sued in their individual capacity, I conclude that Plaintiffs' ADA retaliation claim against the individual Defendants must be dismissed.  I similarly conclude that Section 504 of the Rehabilitation Act does not provide for retaliation claims against persons in their individual capacity, and therefore the individual Defendants' motion to dismiss is granted in part on that claim as well.

### D.    Plaintiffs' Statutory Claims Under 42 U.S.C. § 1983

Plaintiffs attempt to avoid dismissal of their statutory claims against the individual Defendants by asserting that 42 U.S.C. § 1983 provides an alternative mechanism for enforcing these statutes by imposing damages against individual Defendants sued in their personal capacities.  I conclude that 42 U.S.C. § 1983 does not provide such a mechanism for enforcing the IDEA, ADA, or Section 504 against the individual Defendants, and therefore the individual Defendants' motion to dismiss is granted in part with respect to such statutory claims under 42 U.S.C. § 1983.

-20-

42 U.S.C. § 1983 can add nothing to an IDEA claim because the Tenth Circuit has expressly held that this statute "may not be used to remedy IDEA violations." Padilla v. Sch. Dist. No. 1, 233 F.3d 1268, 1273 (10th Cir. 2000).  In support of this holding, the Tenth Circuit reasoned that since Congress amended the IDEA in 1986, the Supreme Court has nevertheless cited the statute on at least two occasions "as an example of an exhaustive legislative enforcement scheme that precludes § 1983 causes of action." Id. (citing Blessing v. Freestone, 520 U.S. 329, 347-48 (1997), and  Wright v. City of Roanoke Redevelopment and Housing Auth., 479 U.S. 418, 423-24 (1987)).

Plaintiffs also may not use 42 U.S.C. § 1983 as a mechanism for asserting claims for violations of Section 504 of the Rehabilitation Act or Title II of the ADA.  See Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2001) (collecting cases).  Like the IDEA, the ADA and the Rehabilitation Act provide "'specific comprehensive internal enforcement mechanism[s] to protect  the rights'" of the statutes' intended beneficiaries,  and "'Congress intended to foreclose resort to the more general enforcement provisions of section 1983 to vindicate the rights created by'" these statutes. Id. (quoting Lollar v. Baker, 196 F.3d 603, 609-10 (5th Cir.1999)); see also Alsbrook, 184 F.3d at 1011; Holbrook v. City of Alpharetta, 112 F.3d 1522, 1531 (11th Cir.1997); Sellers, 141 F.3d at 530-32.  The Supreme Court's recent opinions in Rancho Palos Verdes v. Abrams, 125 S. Ct. 1453, 1462 (2005), and Gonzaga v. Doe, 536 U.S. 273, 289-90 (2002), lend further support to this conclusion.

In light of these authorities, I conclude that Congress did not intend to impose an additional unfunded mandate on schools and their employees by making violations of Title

II of the ADA and Section 504 of the Rehabilitation Act subject to the broader scope of damages available against individual Defendants under 42 U.S.C. § 1983.  Therefore, the individual Defendants' motion to dismiss is granted in part with respect to such claims.

### E.    Plaintiffs' Constitutional Claims Under 42 U.S.C. § 1983

Unlike the statutory claims discussed above, there is no question that 42 U.S.C. § 1983 provides a legitimate mechanism for imposing liability on individual Defendants who directly violate a person's clearly-established constitutional rights.  So long as Plaintiffs have exhausted their administrative remedies, such constitutional claims against individual Defendants are not precluded merely because they share a similar factual basis with the IDEA claims that Plaintiffs are pursuing against an institutional Defendant such as EPS.  See 20 U.S.C. § 1415(*l*); Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1065 (10th Cir. 2002).

42 U.S.C. § 1983 also allows persons to be sued in their individual capacity under a theory of supervisory liability.  To establish supervisory liability under 42 U.S.C. § 1983, a plaintiff must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation.  See Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997); Holland v. Harrington, 268 F.3d 1179, 1187 (10th Cir. 2001).  In particular, a plaintiff must show that the supervisor acquiesced in the constitutional violation through "'personal participation," an "exercise of control or direction," or a "failure to supervise."  Green, 108 F.3d at 1302 (quoting Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir.1988)).

-22-

Persons sued in their individual capacity under 42 U.S.C. § 1983 generally are entitled to qualified immunity unless it is shown that their actions violated a specific constitutional right and that the right which they allegedly violated was clearly established at the time of the conduct at issue. See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). But "officials can still be on notice that their conduct violates established law even in novel factual circumstances," particularly when an official's conduct amounts to "obvious cruelty." Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); see, e.g., Holland, 268 F.3d at 1197 (denying qualified immunity to SWAT deputies "for training a firearm directly on a four-year-old child"). The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional. Hope, 536 U.S. at 741.

When qualified immunity is asserted by means of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), such a defense does not impose any heightened-pleading requirement or evidentiary burden on Plaintiffs. See Currier v. Doran, 242 F.3d 905, 916 (10th Cir. 2001) (concluding that such a heightened-pleading requirement is no longer viable after the Supreme Court's decision in Crawford-El v. Britton, 523 U.S. 574 (1998)); Peterson v. Jensen, 371 F.3d 1199, 1201 (10th Cir. 2004) ("Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review

than would apply on summary judgment.").  Nevertheless, a motion to dismiss based on qualified-immunity still requires Plaintiffs to cite legal authority showing that the factual allegations in their pleading amount to a constitutional violation and that the specific constitutional right at issue is clearly established.  See generally D.N.M. LR-Civ. 7.5(a) ("A motion, response or reply must cite authority in support of the legal positions advanced.").

    **1.**    **Plaintiffs' Due Process Claims Based on the Student's Property Interest in Receiving Free Appropriate Public Education**

Plaintiffs *Second Amended Complaint* asserts that Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, Rachel Mora, and Beverly Averitt violated Plaintiffs' constitutional right to due process by prematurely graduating Plaintiff Glen Martinez from Espanola Valley High School in the Spring of 2001.  In response to the individual Defendants' motion to dismiss these claims, Plaintiffs assert that Plaintiff Glen Martinez has a property interest in receiving a free appropriate public education under  the IDEA and Article XII, Section 1 of the New Mexico Constitution.  Plaintiffs further allege that the group of individual Defendants named above temporarily deprived him of this property interest by repeatedly sending him home from school during his last two years in school (1999 to 2001) and then permanently deprived him of the benefit of attending school by prematurely graduating him in the Spring of 2001.

According to Plaintiffs, these efforts by the individual Defendants to exclude Plaintiff Glen Martinez from school violated both the procedural and substantive components of the Due Process Clause.  "Procedural due process ensures the state will not deprive a party of

-24-

property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000).

To support their procedural due-process claim, Plaintiffs cite Goss v. Lopez, 419 U.S. 565 (1975), and Hatch v. Goerke, 502 F.2d 1189 (10th Cir. 1974). These cases clearly establish that public-school students have a constitutionally protected property interest in avoiding "unfair or mistaken exclusion from the educational process," Goss, 419 U.S. at 579, and as a general rule the Due Process Clause "entitles students in public schools to be accorded the rudimentary elements of a hearing before they are expelled or suspended for a lengthy or indefinite period, absent some extraordinary situation requiring immediate action before a hearing," Hatch, 502 F.2d at 1195.

I conclude, however, that Plaintiffs' citation to the general principles set forth in Goss and Hatch is not legally sufficient to show the violation of a clearly established right when the allegations about the student's exclusion from school are viewed in the context provided by the other allegations of the *Second Amended Complaint*. These allegations do not suggest that the individual Defendants simply transported Plaintiff Glen Martinez to his home (or to another off-campus location) and left him there unattended without informing his parents. While the *Second Amended Complaint* does suggest that the parents were not given much choice as to when the student would be allowed to attend school, at least some minimal level of pre-deprivation notice of his exclusion from school was provided to them.

-25-

The *Second Amended Complaint* also suggests that the individual Defendants' efforts to exclude Plaintiff Glen Martinez from school were one of the ways in which they attempted to cope with his severe maladaptive behaviors in an unsafe classroom, which included loud noises and other disruptions that caused the student to jam his fingers in his ears until they bled, throw items, flip classroom tables over, run away, and engage in self-induced vomiting. To be sure, the factual allegations in the *Second Amended Complaint* also suggest that the individual Defendants lacked the necessary training and supervision to appropriately handle such behavior and that simply excluding Plaintiff Glen Martinez from school was not a professionally acceptable way for them to cope with this problem.

Nevertheless, the maladaptive behaviors and unsafe classroom portrayed in Plaintiffs' pleading suggest a set of exigent circumstances in which the personal safety of several individuals was immediately placed at risk. In such an "extraordinary situation," pre-deprivation procedures can be pared down or abbreviated without violating the Due Process Clause. Hatch, 502 F.2d at 1195; see Goss, 419 U.S. at 582 (acknowledging that "there are recurring situations in which prior notice and hearing cannot be insisted upon," as when the student's presence at school "poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process"); Miller v. Campbell County, 945 F.2d 348, 353 (10th Cir. 1991) ("[W]here the state is confronted with an emergency, it may deprive an individual of his or her property without first providing a hearing."); cf. Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (noting that due process is a "flexible" concept that only "calls for such procedural protections as the particular situation demands").

-26-

Plaintiffs also admit in their *Second Amended Complaint* that they received a full post-deprivation hearing before a due-process hearing officer and an administrative appeal officer of the New Mexico Public Education Department, which resulted in a favorable ruling with respect to the premature graduation issue and several other aspects of the student's education. [Doc. 14, ¶¶ 18-24.] This post-deprivation procedure is relevant to the Court's analysis because there are situations in which no pre-deprivation hearing is required, or in which pre-deprivation procedures can be pared down or abbreviated, so long as "the state provides an adequate post-deprivation remedy." Hamilton v. Myers, 281 F.3d 520, 533 (6th Cir. 2002); see Miller, 945 F.2d at 354; Powell v. Mikulecky, 891 F.2d 1454, 1458-59 (10th Cir. 1989) (discussing circumstances in which a predeprivation hearing may be limited to oral notice and a brief opportunity to respond at the time the notice is given); cf. Garcia v. Miera, 817 F.2d 650, 656 (10th Cir. 1987) (noting the district court's finding that "New Mexico does provide adequate common-law remedies to afford [the student] constitutional procedural due process"). This case presents one of those situations.

Plaintiffs cite no authorities which clearly establish a constitutional due-process claim for lack of pre-deprivation procedures where (1) a student's parents are informed of the deprivation before it occurs, (2) this deprivation arises from the exigent circumstances of an unsafe classroom, and (3) a full array of post-deprivation procedures and remedies are made available under the statutory framework set forth in the IDEA. Accordingly, I conclude that the individual Defendants are entitled to qualified immunity with respect to Plaintiffs' procedural due-process claim.

Plaintiffs also cite no authority on point which clearly establishes that the deprivation of a student's property interest in free appropriate public education violates the substantive component of the Due Process Clause.  It is not enough to simply proclaim in a conclusory manner that Defendants' conduct "shock[s] the conscience," County of Sacramento v. Lewis, 523 U.S. 833, 855 (1998), because

> [i]n order to discern whether the facts of a particular case "shock the conscience" so as to support a substantive due process claim, "we must bear in mind three basic principles highlighted by the Supreme Court . . . :  (1) the need for restraint in defining [the] scope [of substantive due process claims]; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies . . . ."

Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1262 (10th Cir. 1998) (quoting Uhlrig v. Harder, 64 F.3d 567, 573 (10th Cir. 1995)).   The Supreme Court has repeatedly emphasized that  "the Fourteenth Amendment is not a 'font of tort law to be superimposed on whatever systems may already be administered by the States,'" and that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." Lewis, 523 U.S. at 848-49 (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).

For a court to overlay a substantive due-process claim on top of the existing statutory remedies which define a student's property interest in this context would be to use the Due Process Clause as merely a pretext for usurping the role of legislatures in determining the nature and extent of a student's entitlement to public education.  Congress already has made such determinations in enacting the IDEA and other related statutes, and Plaintiffs have

already pursued and obtained many of the post-deprivation administrative remedies available under this statutory scheme.  For these reasons, I conclude that the individual Defendants are entitled to qualified immunity with respect to Plaintiffs' substantive due-process claim as well, insofar as this claim is premised on the student's property interest in free appropriate public education.

### 2.      Plaintiffs' Substantive Due Process Claim Based on the Student's Liberty Interest in Bodily Integrity and Personal Security

I reach a different conclusion with respect to Plaintiffs' substantive due-process claim insofar as it is premised on Plaintiff Glen Martinez's liberty interest in bodily integrity and personal security.  As the individual Defendants acknowledge in their brief, both the Supreme Court and the Courts of Appeals have clearly established that a public-school student has a constitutional right to bodily integrity and personal security under the substantive component of the Due Process Clause.  See Ingraham v. Wright, 430 U.S. 651, 673-74 (1977); P.B. v. Koch, 96 F.3d 1298, 1302 (9th Cir. 1996) (collecting cases from the Third, Fourth, Sixth, Eighth, and Tenth Circuits).  While this right is not measured by a standard equivalent to the "lowest common denominator of customary tort liability," Lewis, 523 U.S. at 848, it is nevertheless implicated when state officials intrude "into realms of personal privacy and personal security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court."  Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980)); accord Garcia, 817 F.2d at 655; Harris v. Robinson, 273 F.3d 927, 930 (10th Cir. 2001).

The factual allegations in Plaintiffs' *Second Amended Complaint*, when considered in their totality, depict a classroom situation that descended into chaos and became sufficiently brutal and demeaning to meet the standard required for a viable substantive due-process claim in this context.  The alleged harm to Plaintiff Glen Martinez resulting from this classroom situation, which is said to include physical manifestations such as self-induced vomiting and self-inflicted wounds to his ears, is of sufficient magnitude to shock the conscience of the Court when considered in light of the severity of his disabilities.  See Harris, 273 F.3d at 930.  Moreover, Plaintiffs' response brief cites a number of professional standards regarding the use of force or other disciplinary measures against persons with severe disabilities [Doc. 35, at 15-16], and the allegations in the *Second Amended Complaint* suggest that the conduct of the some of the individual Defendants substantially departed from these professional standards.  See Heideman v. Rother, 84 F.3d 1021, 1029 (8th Cir. 1999) (concluding that a student must show "a substantial departure from accepted professional judgment, practice, or standards" in order to prevail on a substantive due-process claim in this context).

Of course, Defendants ultimately may come forward with evidence showing that Plaintiffs' allegations are an exaggeration of what really occurred.  They also may attempt to show that despite the unpleasantness of the situation, some or all of the individual Defendants' actions were in accordance with relevant and reliable professional standards.  See Heideman, 84 F.3d at 1029 (concluding that a defendant was entitled to qualified immunity based on undisputed facts which showed her conduct fell within the scope of

professionally accepted choices).  Or, they may present evidence that Plaintiff Glen Martinez's maladaptive behavior presented an extreme danger to the safety of other students or school personnel, and that the governmental interest in controlling this danger was so compelling that it outweighed the student's liberty interests.  Cf. Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998) ("[W]hen an individual is confined in a state institution, individual liberties must be balanced against the interests of the institution in preventing the individual from harming himself or others residing or working in the institution.").

But at this stage of the litigation, Plaintiffs do not bear the burden of coming forward with evidence to counter such defenses.  Instead, they only bear the burden of citing legal authority to show that the factual allegations in their pleading amount to a violation of a clearly established constitutional right in this context.  As there is an abundance of legal authority to support such a showing at this juncture, Plaintiffs have met the minimal burden necessary to overcome a motion to dismiss their substantive due-process claim based on the totality of the circumstances present in the special-education classroom at Espanola Valley High School as it affected Plaintiff Glen Martinez's bodily integrity and personal security during the 2000-2001 school year.

With respect to the 2000-2001 school year, Plaintiffs also have sufficiently alleged an affirmative link between the deprivation of this right to substantive due process and the supervisory conduct of Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, and Beverly Averitt.  See Green, 108 F.3d at 1302; Holland, 268 F.3d at 1187.  The *Second Amended Complaint* alleges that these individual Defendants knew of, and were directly

involved in, the intolerable classroom situation faced by Plaintiff Glen Martinez during this time period. [Doc. 14, at ¶¶ 86, 87, 89, 90, 98.] While it may be true that other students in the classroom contributed to this situation by screaming or engaging in other disruptive behavior, the allegations in the *Second Amended Complaint* cannot be dismissed as mere negligence of state actors in failing to protect Plaintiff Glen Martinez against privately inflicted harms.[4] See Meeker v. Edmundson, 415 F.3d 317, 322-23 (4th Cir. 2005). Rather, these allegations suggest that the four individual Defendants named above knew of the dangerous situation that had developed in Plaintiffs' classroom during the 2000-2001 school year and engaged in affirmative conduct which authorized this situation to persist and grow worse. See Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1239-41 (10th Cir. 1999). Accordingly, I conclude that the *Second Amended Complaint* is legally sufficient to state a supervisory liability claim against Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, and Beverly Averitt during the 2000-2001 school year.

The allegations regarding the nature and extent of Plaintiff Glen Martinez's disabilities lend further support to this conclusion. While "compulsory attendance laws in no way restrain a child's liberty so as to render the child and his parents unable to care for the child's basic needs," Maldonado v. Josey, 975 F.2d 727, 731-32 (10th Cir. 1992), the

_____

[4]To the extent that it is necessary for Plaintiffs to resort to a theory which relies on the duty of governmental actors to protect the student against privately inflicted harms, I conclude in the alternative that the factual allegations in the *Second Amended Complaint* satisfy the elements of both the "special relationship" theory and the "danger creation" theory articulated in Armijo, 159 F.3d at 1261-64, with respect to Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, and Beverly Averitt.

Tenth Circuit also has recognized that a substantive due-process claim of this nature must be considered against the backdrop of a particular student's "severe disabilities," see Sutton, 173 F.3d at 1240.

In this case, Plaintiffs' substantive-due process claim does not rest on the mere existence of generic laws regarding compulsory education or their effect on a student who is not disabled. Rather, this claim presents a situation in which the student's severe disabilities give rise to a reasonable inference that he was unable to care for his own basic needs during the school day, and the special-education regime implemented pursuant to the IDEA and related statutes put the Defendants in a position where they assumed a degree of control over the student's basic needs that is sufficient to trigger an affirmative duty to protect that student while he attended school. See Armijo, 159 F.3d at 1260-61; cf. Hilliard v. City and County of Denver, 930 F.2d 1516, 1520 (10th Cir. 1991) ("Public school students, although not restricted to the same degree as arrestees, convicts and patients involuntarily committed to state mental hospitals, are similarly involved in an environment where the state has some lawful control over their liberty.").

This special relationship entailed by the severe nature of Plaintiff Glen Martinez's disabilities presents an exception to the general rule that "[t]he prisoner and the schoolchild stand in wholly different circumstances." Ingraham, 430 U.S. at 669; see Armijo, 159 F.3d at 1261. Unlike cases where such a special relationship is lacking, see, e.g., Maldonado, 975 F.2d at 731-32, the factual allegations in this case support a reasonable inference that the four individual Defendants named above exhibited a type of deliberate indifference which

is akin to that required to support a substantive due-process claim against a jail administrator for ignoring a pretrial detainee's serious medical needs.  See, e.g., Olsen v. Layton Hills Mall, 312 F.3d 1304, 1315-18 (10th Cir. 2002); Oxendine v. Kaplan, 241 F.3d 1272, 1276-79 (10th Cir. 2001); Sealock v. Colorado, 218 F.3d 1205, 1209-12 (10th Cir. 2000); Ginest v. Bd. of County Comm'rs, 333 F. Supp. 2d 1190, 1196-1203 (D. Wyo. 2004) (collecting cases).  For these reasons, the individual Defendants' motion to dismiss is denied in part with respect to Plaintiffs' claim that during the 2000-2001 school year Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, and Beverly Averitt deprived Plaintiff Glen Martinez of a liberty interest in bodily integrity and personal security that is protected by the substantive component of the Due Process Clause.

I do not agree, however, that the allegations in the *Second Amended Complaint* are legally sufficient to extend this substantive due-process claim to prior school years, or that specific incidents may be singled out from the totality of the circumstances present in the classroom so as to create additional or multiple substantive due-process claims against the other individual Defendants.  In particular, the allegations regarding the September 1997 incident in which Plaintiff Glen Martinez wandered away from school [Doc. 14, ¶¶ 114-20, 236], even if accepted as true, are not legally sufficient to show a substantive due-process violation by Defendant John Garcia.[5]  Similarly, the altercation between Plaintiff Glen

---

[5]Because the Court concludes that Plaintiffs fail to state a claim against Defendant John Garcia, it is unnecessary to reach the alternative argument that any claims against this Defendant are barred by the statute of limitations.

Martinez and his educational assistant, Defendant Adam Romero, that allegedly occurred on or about February 15, 2001, does not give rise to a viable substantive due-process claim in and of itself. [Doc. 14, ¶¶ 140-42.]

At best, such allegations present ordinary negligence or battery claims that are not cognizable under the substantive component of the Due Process Clause for the reasons previously articulated. See Harris, 273 F.3d at 931 (concluding that a teacher who was careless and exercised poor judgment was nevertheless entitled to qualified immunity). Defendant John Garcia's alleged failure to supervise Plaintiff Glen Martinez on the date of the 1997 incident comes too close to the fact pattern alleged in Maldonado, 975 F.2d at 728, to overcome the defense of qualified immunity. Similarly, the 2001 incident involving Defendant Adam Romero falls within the category of corporal punishment that is adequately addressed by state laws and procedures rather than the substantive component of the Due Process Clause. See Garcia, 817 F.2d at 654-56 (citing Ingraham, 430 U.S. at 676). Even accounting for this student's special needs, the allegations against Defendants John Garcia and Adam Romero do not support an inference of obvious cruelty or deliberate indifference to such needs. Therefore, the individual Defendants' motion to dismiss based on qualified immunity is granted in part with respect to the claim that Defendants John Garcia and Adam Romero deprived Plaintiff Glen Martinez of a liberty interest in bodily integrity and personal security protected by the substantive component of the Due Process Clause.

### 3.    **Plaintiffs' Fourth Amendment Claim**

Plaintiffs' *Second Amended Complaint* also attempts to recast their substantive due-process claim as a Fourth Amendment claim premised on the notion that Plaintiff Glen Martinez was subjected to an unreasonable warrantless seizure of his person when school personnel engaged in a practice of "trapping" him in his school desk by placing the desk's only opening against a wall so that the student would have to move the desk away from the wall in order to exit it.  [Doc. 14, ¶¶ 123-24, .]  While I agree that the alleged practice of "trapping" Plaintiff Glen Martinez in his school desk may form part of the totality of the circumstances to be considered in evaluating his substantive due-process claim during the 2000-2001 school year, I do not agree that this practice alone shows a violation of a clearly established Fourth Amendment right that is legally sufficient to overcome the defense of qualified immunity.

The Supreme Court has noted that "the principal concern" of the Fourth Amendment's "prohibition against unreasonable searches and seizures is with intrusions on privacy in the course of criminal investigations."  Ingraham, 430 U.S. at 674 (citing Whalen v. Roe, 429 U.S. 589, 604 n. 32 (1977)).  And when interests protected by the Fourth Amendment are implicated in the "public school context," the Supreme Court has been careful to account for the presence of "'special needs, beyond the normal need for law enforcement, [which] make the warrant and probable-cause requirement impracticable.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646,  653 (1995) (quoting Griffin v. Wisconsin, 483 U.S. 868, 873  (1987)).

To support their Fourth Amendment claim in this case, Plaintiffs cite only cases involving law-enforcement officers outside the public school context.  These cases are inapposite for purposes of defeating qualified immunity because they do not account for the "special needs" that the Supreme Court has found to exist in this context, and there is no allegation that the individual Defendants were pursuing a criminal investigation or law-enforcement objective when "trapping" the student in his school desk or otherwise restraining him.

All public-school students are, in a sense, "seized" within their classrooms or school campuses insofar as there are compulsory attendance laws under which these students are not free to leave these areas during the school day.  Such a "seizure" normally does not give rise to a viable Fourth Amendment claim because it is objectively reasonable in light of these compulsory attendance laws, and because it serves the State's legitimate interest in creating an environment in which students can be educated.  See Gottlieb v. Laurel Highlands Sch. Dist., 272 F.3d 168, 171-72 (3rd Cir. 2001).  In the case of Plaintiff Glen Martinez, the reasonableness of confining him to a particular area of the school also is underscored by the need to prevent the recurrence of the kind of incident that allegedly occurred in 1997 when he wandered off the school campus and injured himself.

To the extent that Plaintiffs allege the individual Defendants carried out such a seizure in an excessive or punitive manner, their allegations are more appropriately addressed as deprivations of his liberty interest in bodily integrity and personal security under the substantive component of the Due Process Clause.  Id. at 172; see Gonzales v. Passino, 222

F. Supp. 2d 1277, 1280 (D.N.M. 2002) (collecting cases).  Plaintiffs have not identified clearly established law which would make such a claim viable under the Fourth Amendment as well.  For these reasons, the individual Defendants' motion is granted in part with respect to Plaintiffs' Fourth Amendment claims.

### 4.      Plaintiffs' Equal Protection Claim

Plaintiffs' final constitutional claim arises under the Equal Protection Clause of the Fourteenth Amendment.  In response to the individual Defendants' motion to dismiss, Plaintiffs explain that their equal-protection claim is based on a classification between "developmentally disabled students" and their "non-disabled peers."  [Doc. 35, at 36.]

Plaintiffs acknowledge that developmentally disabled persons do not constitute a suspect class, and therefore courts will generally uphold classifications based on disability so long as they are supported by a rational basis.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 442 (1985).  On the other hand, the Supreme Court also has acknowledged that "context matters" in evaluating the merits of an equal-protection challenge, see Grutter v. Bollinger, 539 U.S. 306, 327 (2003), and thus the result of such a challenge is not dictated solely by whether the standard of review is strict scrutiny or the rational-basis test, see id. at 325 (concluding that strict scrutiny was not fatal to a law-school admissions program); Cleburne Living Ctr., 473 U.S. at 450 (concluding that a zoning ordinance did not pass the rational-basis test because the ordinance rested on "an irrational prejudice against the mentally retarded").

In the context of public education, even a classification based on a seemingly innocuous criterion such as a student's place of residence "must be justified by a showing that it furthers some substantial interest." Plyler v. Doe, 457 U.S. 202, 230 (1982).  While public education is not a fundamental right, it is nevertheless "distinguishable from other forms of social welfare legislation" because of "the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child." Id. at 221.  For these reasons, the rational-basis test must be applied with extra care in the context of public education, and I cannot summarily dismiss Plaintiffs' equal-protection challenge on the grounds that there might be some conceivable state interest that would justify every aspect of the individual Defendants' alleged treatment of Plaintiff Glen Martinez in this case.

Plaintiffs readily admit that there are rational grounds for many of the ways in which disabled students are treated differently than their non-disabled peers.  Indeed, many of these differences are rationally related to the nature and extent of the students' disabilities and the particular requirements that Congress has established for their benefit under the IDEA and similar statutes.  See Cleburne Living Ctr., 473 U.S. at 443 (collecting statutes).

Accordingly, I do not construe Plaintiffs' equal-protection claim as calling into question every difference in treatment between the disabled and the non-disabled, nor do I construe this claim as an invitation for the Court to rewrite the statutory requirements of the IDEA or to revisit every issue that was previously litigated in the administrative proceedings conducted pursuant to that statute.  I must decline such invitations because the Equal

Protection Clause of the Fourteenth Amendment was never intended to make federal courts into "general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking:  a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system."  <u>Jennings v. City of Stillwater</u>, 383 F.3d 1199, 1211 (10th Cir. 2004); <u>accord</u> <u>Cleburne Living Ctr.</u>, 473 U.S. at 442-43; <u>Heideman</u>, 84 F.3d at 1031.

I must also limit the scope of Plaintiffs' equal-protection claim to the 2000-2001 school year because the allegations in the *Second Amended Complaint* do not  affirmatively link this claim to conduct committed by individual Defendants in prior years.  For example, Plaintiffs' pleading only alleges that Defendants Mary Agnes Martinez, Robert Romero, and Beverly Averitt were employed in a supervisory capacity relevant to Plaintiffs' claims beginning in June 2000, and no period of time is specified for Defendant Michael Katco's employment.  [Doc. 14, ¶¶ 4, 5, 6,11.]  Similarly, Plaintiffs only allege that Defendants Michael Van Damme and Rachel Mora were employed as Plaintiff Glen Martinez's special-education teachers for a portion of the 2000-2001 school year.  [Doc. 14, ¶¶ 7,8.]  Thus, Plaintiffs' allegations do not support a reasonable inference that these individual Defendants knew of the situation and were in a position to put a stop to it before the school year began in the Fall of 2000.

With respect to the 2000-2001 school year, however, Plaintiffs have alleged an affirmative link between their equal-protection claim and the conduct of Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, and Beverly Averitt.  See <u>Green</u>, 108 F.3d

at 1302.  The basis for establishing this affirmative link essentially parallels the factual allegations that were previously articulated with respect to Plaintiff Glen Martinez's substantive due-process claim based on his liberty interest in bodily integrity and personal security.

Plaintiffs also have alleged a direct link between their equal-protection claim and the conduct of Defendants Michael Van Damme and Rachel Mora during the 2000-2001 school year.  These two Defendants were each employed as Plaintiff Glen Martinez's special-education teacher at Espanola Valley High School during a portion of the 2000-2001 school year.  And unlike Defendants John Garcia and Adam Romero (whom Plaintiffs do not name as Defendants for purposes of their equal-protection claim), the allegations pertaining to Defendants Michael Van Damme and Rachel Mora are not limited to a single, discrete incident or to a subservient role having little or no authority to influence official decision-making.

With respect to the 2000-2001 school year, Plaintiffs have identified some aspects of the alleged treatment afforded to Plaintiff Glen Martinez by the above-named Defendants that do not appear to bear any rational relationship to the legitimate differences between the educational needs of the developmentally disabled and those of their non-disabled peers.  Plaintiffs allege that such aspects of the student's treatment are instead attributable to these individual Defendants' irrational and invidious belief that developmentally disabled students "were not worth saving" and should simply be cast aside or excluded as an unwanted burden on the school system.  [Doc. 35, at 37.]

-41-

While it is obvious that Plaintiff Glen Martinez needed to be treated differently from his non-disabled peers in many respects because of the nature and extent of his disability, I cannot conclude at this preliminary juncture that all such differences are wholly attributable to these legitimate needs.  At this point, there is no obvious explanation in the record as to why, after receiving repeated complaints about the shortcomings in this student's education, the group of individual Defendants named above persisted in failing to keep attendance records for this student, failing to issue report cards for him, failing to hire and train qualified staff to educate him, allowing his classroom situation to degenerate into chaos, and then prematurely attempting to graduate him from school without following the procedures mandated by the IDEA or other statutes.

To be sure, the evidence ultimately may show that at least some of these alleged shortcomings can be attributed to mere negligence or lack of resources.  But taken as a whole and viewed in the light most favorable to Plaintiffs, they also support a reasonable inference of invidious discrimination.  Especially telling in this regard are the statements Plaintiffs attribute to some of the individual Defendants to the effect that Plaintiff Glen Martinez did not belong in school, and the allegations that some of the individual Defendants participated in falsifying educational records in order to prematurely exit him from their school.

Assuming the truth of the allegations in the *Second Amended Complaint* and making all reasonable inferences in Plaintiffs' favor, I agree that these allegations are legally sufficient to state an equal-protection claim against the above-named Defendants based on an invidious hostility or contempt toward persons who are developmentally disabled that is

not rationally related to any of the legitimate educational goals of the IDEA or other public-education statutes.  Such a claim is akin to the "irrational prejudice against the mentally retarded" that failed the rational-basis test many years ago in Cleburne Living Ctr., 473 U.S. at 450.  More recently, the Tenth Circuit has recognized that wholly improper subjective motives such as  "ill will," "personal animus," or "sheer malice" may provide the basis for a viable equal-protection claim even when that claim is asserted by a "class of one." Jennings, 383 F.3d at 1211 (citing Bartell v. Aurora Pub. Schs., 263 F.3d 1143, 1149 (10th Cir. 2001)); cf. Heideman, 84 F.3d at 1031 (acknowledging that there are "instances of discrimination against the retarded that are in fact invidious and that are properly subject to judicial correction under constitutional norms").

It bears repeating that the individual Defendants who remain in this litigation must be afforded a fair opportunity to present evidence that the shortcomings which occurred during their tenure at the school were legitimate or unavoidable for reasons that have nothing to do with any invidious discriminatory intent toward the developmental disabled.  At this stage of the litigation, however, Plaintiffs do not bear the burden of coming forward with evidence to refute such allegations, and the Court cannot simply accept the representations of Defendants' counsel at face value.  See Currier, 242 F.3d at 916; Peterson, 371 F.3d at 1201. Accordingly, the individual Defendants' motion to dismiss is denied in part with respect to Plaintiffs' claim that Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, Michael Van Damme, Rachel Mora, and Beverly Averitt deprived Plaintiff Glen Martinez

of equal protection under the law based on an invidious and irrational hostility or contempt toward the developmentally disabled during the 2000-2001 school year.

III.   **CONCLUSION**

For the foregoing reasons, the Court grants the individual Defendants' motion in part and denies their motion in part.  The result of the Court's ruling is that the only remaining claims against the individual Defendants are (1) the claim for a deprivation of Plaintiff Glen Martinez's liberty interest in bodily integrity and personal security under the substantive component of the Due Process Clause against Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, and Beverly Averitt during the 2000-2001 school year; and (2) a claim for violation of Plaintiff Glen Martinez's Fourteenth Amendment right to equal protection based on the alleged irrational discriminatory animus of Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, Michael Van Damme, Rachel Mora, and Beverly Averitt during the 2000-2001 school year.

Because it is necessary to promptly establish new pretrial deadlines for these remaining claims against the individual Defendants as well as Plaintiffs' claims against Defendant EPS, the Court denies the parties' motion to vacate the pretrial conference set for January 3, 2006, at 9:00 a.m.  The Court will use that setting to meet with the parties concerning the establishment of new pretrial deadlines.

The status of Plaintiffs' claims and the individual Defendants is further summarized in the table below.

**Table 2:**     **Remaining Claims After Court's Ruling on Motion to Dismiss**

| | Espanola Public Schools | Mary A. Martinez | Robert Romero | Michael Katco | Michael Van Damme | Rachel Mora | Adam Romero | John Garcia | Beverly Averitt |
|---|---|---|---|---|---|---|---|---|---|
| ADA & Section 504 Discrimination | X | | | | | | | | |
| ADA & Section 504 Retaliation | X | | | | | | | | |
| 42 U.S.C. § 1983 Due Process Property Interest in Education | X | | | | | | | | |
| 42 U.S.C. § 1983 Due Process Liberty Interest in Bodily Integrity | X | X | X | X | | | | | X |
| 42 U.S.C. § 1983 Fourth Amendment Seizure | X | | | | | | | | |
| 42 U.S.C. § 1983 Equal Protection | X | X | X | X | X | X | | | X |

**IT IS THEREFORE ORDERED** that the *Individual Defendants' Motion for Qualified Immunity or to Dismiss Claims Pursuant to Rule 12(b)(6) for Failure to State a Claim* [Doc. 27] is **GRANTED IN PART** with respect to:

1.      Plaintiffs' retaliation claims under the ADA and Section 504 of the Rehabilitation Act against the individual Defendants in their personal capacities;

2.      the ADA and Section 504 claims that Plaintiffs assert against the individual Defendants in their personal capacities under 42 U.S.C. § 1983;

3.      the substantive and procedural due-process claims against the individual Defendants in their personal capacities for depriving Plaintiff Glen Martinez of his property interest in receiving free appropriate public education;

4.      Plaintiffs' Fourth Amendment claim against the individual Defendants in their personal capacities;

5.      all of Plaintiffs' claims against the individual Defendants in their official capacities;

6.      The substantive due-process claim against Defendants John Garcia in his personal capacity for depriving Plaintiff Glen Martinez of his liberty interest in bodily integrity and personal security in connection with the 1997 incident in which Plaintiff Glen Martinez wandered off the school campus and injured himself; and

7.      The substantive due-process claim against Defendant Adam Romero in his personal capacity for depriving Plaintiff Glen Martinez of his liberty interest in bodily integrity and personal security in connection with the February 2001 classroom altercation.

**IT IS FURTHER ORDERED** that the *Individual Defendants' Motion for Qualified Immunity or to Dismiss Claims Pursuant to Rule 12(b)(6) for Failure to State a Claim* [Doc. 27] is **DENIED IN PART** with respect to:

1.      The substantive due-process claim against Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, and Beverly Averitt in their personal capacities for subjecting Plaintiff Glen Martinez to a dangerous and abusive classroom environment during the 2000-2001 school year in violation of his liberty interest in bodily integrity and personal security; and

2.      The equal-protection claim against Defendants Mary Agnes Martinez, Robert Romero, Michael Katco, Michael Van Damme, Rachel Mora, and Beverly Averitt in their personal capacities for subjecting Plaintiff Glen Martinez to discrimination during the 2000-

2001 school year based on an invidious hostility or contempt toward the developmentally disabled that is not rationally related to any legitimate educational goals.

**IT IS FURTHER ORDERED** that the stay of discovery granted in prior orders issued by the United States Magistrate Judge [Doc. 30, 31] is hereby lifted with respect to all remaining claims and Defendants in this action.

**IT IS FURTHER ORDERED** that the parties' *Joint Motion to Vacate Pretrial Conference* [Doc. 43] is **DENIED**, and **the Court will meet with the parties to establish new pretrial deadlines at the previously scheduled pretrial conference set for January 3, 2006, at 9:00 a.m.**

**SO ORDERED** this 22nd day of December, 2005, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**